Next case, Mark Schewe v. Schewe Farms, L.L.C. Case number 5-16-0192. Counsel for the Attendant. You may proceed. Please state your name for the record. May it please the Court, Counsel, my name is James Richard Myers. I represent the appellant, the original appellant in this case, Mark Schewe. Counsel, I hate to start off right, but I've got a question about jurisdiction. Okay. There were five counts. The trial court entered the ruling on count five. Does this Court have jurisdiction in this appeal for a final judgment as I couldn't see in the record where counts one, two, three, four were adjudicated? I don't have my copy of the complaint here, but I believe that we have a final order and that the dispute has been completely resolved. I don't specifically remember the varying counts, but there were several. It's my recollection they were all resolved as a final order. I believe Judge Knight indicated the final order in his rules. If you think that's in the files, go ahead. I don't want to, but that's a question I have. That would be a fair question. I note that Judge Knight in his order, the trial court indicated it's a final judgment and there's no just reason to delay appeal or enforcement of the order. That's in the appendix, page 26. That's record 1370. I can look at that. Thank you. The case on appeal came from a trial court where I believe anyway there's several multiple issues and briefs that you've seen, but they fall into two main categories. The big question in the case obviously is the value of this entity shoeing farms LLC, which my client is dissociated from. And the other questions basically revolve around who pays, who is liable, who is expert fees and things like that. And the other issues are also important and brief, but those are the two things I wanted to talk about today because I think those are the most important and certainly the major issues in the case. At its core, this case was about the fair value of shoeing farms LLC and my dissociating members, as I call them, my client's interest in the LLC. There's no dispute that they had defined interest in the corporation approximately 27.5%, I believe. But there was a significant dispute over the value, the fair value of shoeing farms LLC at the trial court. There was two experts that testified on the brief side. And what I'd like to do is look at what shoeing farms is. And what shoeing farms is, as determined by this trial court, is a limited liability company that primarily holds real estate. The trial court found that the LLC had assets valued at just under $10 million, consisting of $9,700,000 in real estate holdings, about $150,000 in bank, and $60,000 in account receivables. If you do the math on that, the corporation is 97.7% real estate. So it holds real estate, and that's about all it does. What does the company do with this property, would be a fair question. It rents it out. And the evidence in the trial was, since at least 2000, the land had been rented out to farmers, and the corporation received rents. Initially, at that time period, the rents came in the form of crops, because there was a crop share lease, which is common in southern Illinois, where the farmer gives a portion of the crop to the landlord, and then the landlord could be involved with that. It usually liquidates it and turns it into money, obviously. But then later, it turned into a cash rent, where the tenant simply pays by check or whatever to the company. The company, during this time period, never had employees. There's no evidence of any employees. There's no evidence that it owns farm equipment. There's no evidence that it did anything other than have real estate and lease it out to farm tenants. And what that makes Shoei Farms is a holding company, a term that was defined by both the experts that testified at trial, Mr. Ball. Judge Knight found that it was not. Is that correct? That's correct. And what would be the standard of review on that finding? I guess manifestly in the evidence, Your Honor. Thank you. With both experts testifying that it was in fact a holding company, we believe that it was error for the court to hold that it was not. And in some ways, that's a semantic argument because, obviously, holding company is a term that these experts use to call it is what it is. Our experts said when you have a holding company, you have to use net asset value, so it matters. I'm not sure if the other experts said how you should value a holding company exclusively as a holding company. But if you think about it, this – well, what the law requires is that the company be valued as a whole and its net intrinsic value, which is the words from the case that I cited, the Brinwood case, of the whole thing. And then you determine each party's interest of the whole. So it's a little different than estate tax returns or other things where you try to minimize or you try to use methods to reduce the value, like limitations on my ability to control what the company does or limitations on my ability to sell my shares because there's no open market for it. That's not what this process is. This process is evaluation of the company as a whole and then an acknowledgment that I own collectively 27.5% of it. And if you look at this company, when you do that, if I were to purchase Shoei Farms LLC tomorrow, the whole entirety of it, I would own all these assets in a corporate form, and I would realize value of that by selling them. I would sell them tomorrow, and I would sell them and realize the net asset value of the company. And that's why net asset value is the logical and fair way to value a company like this. On the question of valuation, what is the standard of review? I didn't hear the first part. On the question of valuation, what is the standard of review? I believe that that would be a... Excuse me. Abuse of discretion. That's the words I was looking for. Thank you. Abuse of discretion. Correct. And I acknowledge, and I think counsel will acknowledge as well, that when the trial court makes these findings like that, when you're appealing, you have a higher standard to reach because it is these standards against the manifest way of the evidence that abuse of discretion. And I believe the judge would certainly have discretion, but it's our position that he either abused that discretion or, in the case of the holding company, determination that he was against the manifest way of the evidence because it wasn't a holding company. But to my point, this is not like a company that sells products or has goodwill or has an income stream from leases that are long term or has a product it can sell over time. It's simply the value of its assets. And that's what the holding company determination acknowledges, and that's why that is a reasonable valuation. But as far as the experts that testified at trial in this case, one of them followed the procedure that you're supposed to under the law and the other did not. Our expert valued the company as a whole, the entirety of it, the net asset value, and then he said this member owns 10 percent, so he gets 10 percent of the value assigned to him. This member owns 5 percent, he gets 5 percent assigned to him. That's what the case law seems to indicate that the process should be. And I cite Peter Lee, which is a corporation case, not an LLC case, but it was the same question. It was determining the fair value of the entity. That one involved a Chicago company that owned a building, and they determined the net asset value would be the value of that building, which was going to be sold, but that was irrelevant to the holding. The value of that building, and then in that case they deducted out some taxes and some capital gains and things like that because there was a plan to sell the building. But basically said the value of the whole is the value of this building, and your part of it is your percentage interest in this whole. That's what our expert did. Their expert didn't do that by his own admission. By his own admission, he valued the percentage interest of these people and not the value of the company. He admitted that those are two different things, and so we believe that the expert they have didn't do a correct valuation of this pursuant to the statute, and so his methodology being fundamentally flawed doesn't hold water in the analysis. So are you asking for a remand evaluation? I am not asking for a remand of the evaluation. I normally would in a case like this, but what we are saying is that the net asset value is the appropriate value to use, and the trial court in fact determined as part of his analysis the net asset value should fall. He did that as part of a larger analysis that mirrored other accounts' experts' analysis. But in that analysis, he determined the net asset value of the company, and it was $9,255,412. And so I believe our position is under Rule 366 that the court can enter a judgment based on those findings of the trial court that that was the net asset value of the company. There would potentially be other issues. As I said, there are several issues in those briefs that would require a remand, but I don't believe that the valuation of the company requires a remand. The percentage interest held by the various parties was uncontested, so that wouldn't require a remand. I believe that judgments could be entered by this court on those questions. Didn't Judge Knight find that the termination by the minority was a wrongful termination and a violation of the operating agreement? He did, and I was about to segue to that aspect of it, so I can address that. That comes under my analysis of the attorney's fees, and you are correct, Your Honor, that Judge Knight's trial court did determine a wrongful dissociation. Could it be that that would also affect valuation? It is an equitable case, and so aspects of equity could come into the valuation argument. Isn't that an aspect of valuation when you're valuing a going business or going concern if the court were not to accept your version of this as a holding company? If the court does not accept that this is a holding company, then I believe that other methods or factors on the value of the company could come into play. I don't know that the fact that there's a wrongful dissociation termination would be one of those factors because we are to look at the value of the company on the day that my clients dissociated from it, and at that time there wouldn't have been a wrongful dissociation. It would have been a company that admittedly had management issues, admittedly had dissension in the ranks. But there had been no dissociation. I think that's the time to look at to make the determination of the value of the individual shares. So what method other than holding company, if it's not a holding company, would be the preferred method? Did Judge Knight not get that correct? If he is to determine it's not a holding company, then I personally believe that Judge Knight's also maybe ruling that is not supported by the evidence because his analysis takes things that were never testified to and were never questioned and puts it together to reach the decision he ultimately reached. So I'm not advocating that point because I don't believe that any of that should matter. It should be the holding company with that asset value. But I think if we're talking about value in another company, I don't think Judge Knight can do what he did in manufacturing the value that's not based on what the experts testified to or what the witnesses testified to. How did he do it? How did Judge Knight do it? Yes. My understanding is that looking at it, of course I didn't ask him, but my understanding looking at it is... What's the judgment say about that? The judgment says that he basically took the expert's analysis of the other party and redid the numbers with some factors that were testified to. Thank you. I'll give opposing counsel an opportunity to respond to that same issue. I'd be happy to take other questions on that issue, but I'd like to address quickly before I run out of time the attorney's fees provisions of this and the wrongful dissociation comes into this as well because, again, we don't believe there's a wrongful dissociation because that statute provides that a dissociation is only wrongful if there's a violation of an express provision of agreement. There is no express provision of agreement in the Shuey Farms LLC that prohibits dissociation. The case that's cited by counsel is the Federal Relfia Steel case, the bankruptcy case from the North District of Illinois. If you look at that case, there's a provision in the operating agreement of that company that clearly says you cannot dissociate from this company, and if you do, it's deemed wrongful. And so it's possible to put in agreements like this that dissociation should not occur and that it's wrongful, but that's not in this agreement. And both the judge at the trial level and counsel tried to put together some implicit reasons or some other things why we can't dissociate, but that's exactly what they are. They're implicit or they're roundabout ways of getting to there. There's no express provision that was violated when the party dissociated, so the prohibition or the dissociation cannot be wrongful. The trial judge awarded attorney's fees and costs for the other side against my side based on wrongful dissociation. Even if the dissociation is wrongful, that's not within the trial court's ability because both of those damages, attorney's fees and expert witness fees and things like that, are only awardable in Illinois when they're specifically itemized in the statute that's being used, and this statute just said damages. And even in this particular act that we're talking about today, we know the legislature knows how to itemize when you can recover attorney's fees and expert fees because that's what they did in the statute that I'm claiming attorney's fees under, which is the vexatious delay lack of good faith statute, which says that you can recover specifically those things. This portion of the statute only says you can recover damages whenever those damages are proven to be. It doesn't specifically say attorney's fees. It doesn't specifically say expert fees, so we believe the judge was outside his authority in awarding those. And lastly, I just wanted to address the attorney's fees that we are seeking. The brief that I filed outlines a timeline of about 400 or so days where we believe that shows vexatious delay and lack of good faith under the statute. That statute, when you dissociate, requires the corporation to give you a value offer within 30 days and says if you don't do it in 30 days, that's reason enough to make a finding of lack of good faith or vexatious delay. In this case, I outlined a timeframe where we didn't receive any offer, an offer at all like that, until day 467, not day 100, not day 200, not day 300, day 467. And the offer itself arguably was insufficient, but I'm not even talking about that. I'm talking about 467 days when we're supposed to have it in 30 days. And then it's amplified by, if you look at that timeline, the corporation finally got an expert. Let me get it right. On day 455, and 12 days later we have the offer that they're writing. So they could have done it easily in 12 days. In fact, they could have done it in 3 days because their expert testified he got his assignment on day 464, and we had the offer on day 467. So it could have been done in 3 days, but for some reason it was 467 days. And so we believe that that sets forth a showing of lack of good faith and vexatious delay, which would allow the recovery of attorney's fees by my clients. Unless there's questions, that's all I have for now. Thank you, Counsel. You will have an opportunity to reply. Thank you. Counsel for Appley. Thank you. It pleases the Court, Counsel. My name is Tom DeVore. I'm here on behalf of the defendants and cross petitioners in this cause, the Shuey Family LLC, as well as Virginia Shuey, Laura Kennedy, and Bill Shuey. Counsel, I'll ask you the same question at the outset. Does this Court have jurisdiction? What happened to counts 1 through 4? You know, Judge, that's a fair question when you ask it. I got into this case long after those first four counts had, by the actions of the parties, been kind of rendered moot in that they sought, and I think I can answer that a little bit, at least as the facts. But as to the jurisdiction, I don't know, as I sat there and thought about it, that there was any fight or order entered on those four particular matters. It's my opinion as Counsel that those matters were rendered moot by the dissociation claim and that for all intents and purposes, the matters in front of the parties, as far as they're concerned, in the Court is this dissociation. So those other counts I will touch upon briefly that were in there, again, those had been addressed long before I got into this case, and I don't believe they were even in controversy at the point that I had gotten in. That's the best I can respond to that, sir. I'd like to, if I could, take a brief second and talk about a little bit of history. I think it's important for the Court. I think we lay it out, but I'd like to just give a real quick resuscitation. Morrison, Virginia, Shuey, in the late 90s, put this LLC together. They had acquired 750 or 800 acres in their life. And in the late 90s, Mr. Shuey, as I understand, his health was getting poor, so they put this LLC together, and they put it in there for reasons. And if you've read the operating agreement, it talks about how they wanted to preserve and unify this property to manage, to hold, to lease for farming operations. There's nothing in the operating agreement that talks about putting it in there for appreciation of value so they can flip it. Ms. Shuey testified to the contrary. That was never her intention. So they put this LLC together. Mr. Shuey passed away sometime shortly thereafter. A year, year and a half. And then the property then, Ms. Shuey was in control of until three years later. She transferred her husband's 50% to 10% each, the membership interest, to each of their five children, which two of them are with Ms. Shuey as far as Laura and Bill. The other three children are the plaintiffs seeking to dissociate. So in 2003, she transferred that. So at that time, she's a 50% member, and each of her children are a 10% member. And consistent with the operating agreement, as it weighed out from 2000, and Mr. Shuey passed until 2011, Mark and Bill, the sons, were farming the real estate. And they farmed it, and they farmed it on a crop share. That was a testimony. Until sometime in 2009, they decided to do some, I don't know if they probably, their farmers could explain it. I didn't really understand. It was a base rent plus some kind of bonus. So they changed the structure. And then in 2011, the partnership of Bill Shuey and Mark Shuey, the two sons, disintegrated. That's where this all, this is the genesis of all of this. And so they came to an agreement in the fall of 2011 to break up their partnership. Mark Shuey testified he didn't want to farm anymore. At that scale, he wanted to cut back. He wasn't comfortable with the debt that the partnership had taken on. So him and his brother came to an understanding. That was litigated, but they came to an understanding. Bill would take all of this equipment that had a lot of the debt, and Mark wouldn't get all the equipment with debt because he was backing off, wasn't going to farm as much. They came to that agreement. Between the time they came to that agreement in late 2011 and beginning of 2012, the LLC is going to have its annual meeting. At that point in time, Mark Shuey decided that he wanted to farm some part of approximately 300 acres, the record would show, of the LLC property there and where this all starts. They go and have that meeting. At that meeting, Mrs. Shuey, being the matriarch, 50% owner, concluded that she wanted her son Bill to farm the ground because she didn't want to break it up and have different people farming different pieces, and that she wanted her son, who had taken on all the debt of the partnership, to be able to farm the ground. That was her decision, and one other, Laura Kennedy, another 10% owner, agreed. Mark Shuey testified that that upset him. Diane testified it upset her. Marsha, she hadn't been to a meeting in some time, so she didn't have an opinion other than she wasn't there. They all, at that time, unanimously agreed, and I think this is important for wrongful dissociation, they unanimously agreed that they were going to take specific acts to try to stifle the activities of the LLC. They quit participating as members. They go to meetings. There was some obscure language of what it took to be a quorum, and they were saying that if there were three of them, it's six, that it wasn't a quorum. It was written poorly whether a quorum was a majority of membership interest or a majority of members, so they played upon that. July of 2012, the lawsuit gets filed. The initial lawsuit, the first four counts, as Your Honor discussed, it was seeking to force the company to let Mark Shuey farm some of the ground. Even though the LLC didn't want to, they were seeking some other types of relief to kind of force them or have the court help them control this business. In early 2013, they got an injunction to where the company couldn't spend any money without the court's authority, things of that nature. And after Mark testified and after all of those efforts were really fruitless to get what he wanted, in July of 2013, they sent a letter of dissociation. Now, it's our argument that dissociation, which is supported by the federal failure case, occurred much sooner in this written letter, and I can get to that if the court, we get to that, or the court asked me to take it on earlier. But they just give this letter. After they gave that letter in 2013, June 27th, here sits the LLC with an injunction they can't spend any money. And on August 1st, 33 days later, another letter gets sent saying, you haven't given us our offer within 30 days. 19 days later, they file a motion to compel, in this case, to compel the LLC to buy their distributional interests. That was heard in September of 2013, and Judge Knight denied it. Judge Knight's ruling was that we've got all this stuff going on, I'm not at this time forcing anybody to buy anything. Because it takes bedtime to attend it over a year. Counsel then, on behalf of the dissociating members, filed a request to add count five, if Your Honor pointed out. That was immediately withdrawn. A new case gets filed in the Bond County Court, 2013 CH44, seeking payout of the dissociation because they hadn't been paid in time. There was a motion for substitution of Judge filed on Judge Knight, sending it to the other court, which was Judge Slemmer. That's when I got into the case. I immediately filed a 619A3 motion saying that this case is duplicative. You've already addressed this in Judge Knight's court in your motion to compel. This case is improper. Judge Slemmer agreed with me, dismissed that cause, and then we get back to the other case. I filed a counterpetition then for wrongful dissociation. Counsel asked for leave to add the dissociation claim into that existing case. By that time, we're in June of 2014. At that time, Judge Knight entered an order saying we had until October to give a proposal of how much the value would be. Those are some of the facts and circumstances to help explain why it took so long from June 2013 to actually get to the point to where there could be an offer made. They had all this legal activity going on, new cases filed and compelling, etc. There was no bad faith on my client's part. They were barred by an injunction to spend any money. I got that lifted as I argued to the court successfully that once they dissociated, they're not members anymore. They don't have any rights to help control this company through the court because they don't have any standing. We won that argument, and so that was lifted, and we were then able to move on. So we got to the point where we had submitted an offer for $257,000. It was submitted on October 7th in that court, and so they're $3.2 million, we're at $250,000, and that's where we start this process of what is fair value. That's how we got to the fair value argument and also to our dissociation claim. There were two experts in this case. There was Mr. Walpert, and then there was Mr. Osborne. They were the experts on fair value. There were two experts on the appraised value of the property. The court sided with our expert on that. I don't think that's been raised in this appeal, that they disagreed with that. So for all intents and purposes, the fair value that we're debating is whether or not Mr. Waller's opinion or Mr. Osborne's opinion was more appropriate or some in the middle that the court might have found. I think that will address your question as you would ask Mr. Myers, sir. But as to fair value, one thing that counsel kind of touched upon, but I think it's important to get to the fair value, is was or was this not a holding company? Because if it's a holding company, you don't have to use net asset value alone, but you can. It's permissible. It's not mandatory, but it is permissible, and both of the experts did say that, that, yeah, you don't have to, but it's appropriate. Mr. Waller also testified that if it's not a holding company, that net asset value alone is improper. You cannot use it alone if it's not a holding company. That's important. Mr. Waller's definition that he used for a holding company is whether the assets are held to maximize appreciation and not to maximize earnings. That was his definition, okay? And he further explained it, though. You could buy real estate to hold it for appreciation and then to sell it. He admitted now that that definition can be found nowhere in any of the professional standards of appraisals. It doesn't exist. That's his interpretation, and that's his definition. There's no case law that he was aware of. There's nowhere in the LFC Act where he could recite any authority other than his opinion that if you hold an asset for appreciation only and not to maximize earnings, it's a holding company. Now, when Mr. Waller was pushed on how did he conclude that it's a holding company, he had three things at his disposal that he got solely from counsel. As we go along, it will appear that Mr. Waller, in doing his evaluation of this nine-plus-million-dollar company, he never talked to his soul. He never talked to the remaining members. He didn't talk to Mrs. Shuey, Virginia Shuey, who was one of the originating members. He didn't even know an originating member still existed when I asked him that at court. He didn't talk to anyone. He didn't talk to his own clients. Mark Shuey didn't even know the name of his ex-wife. He had the letter that was sent on June 27, 2013, that letter of dissociation where they demanded $3.2 million. He had that. He had five years' tax returns from 2008 to 2013, and he had a few other peripheral items. That's all that he had. When I asked him about the tax returns, I said, well, so you're saying it's your testimony that the tax returns don't have any income on them, no sale of any goods, and he's like, no. So when I showed him the 2008 tax return, it actually had crop sales on it, he recognized that it did, but still said that wouldn't change his opinion that it's a holding company. Mr. Waller, as I said, he only talked to the attorney. In the record, you'll find a letter that Mr. Waller got from counsel and asked the court to read that. It hasn't. In that letter, it says that the counsel was looking only for an informal opinion. He wasn't looking for an opinion. He wanted an informal opinion. And he asked that after he looked at this dearth of information to give counsel a call so they could discuss what his opinion was before he was hired to give an opinion. Mr. Waller testified that he did, in fact, have that phone call, and after that phone call was had, that he was hired to give an opinion. And I asked Mr. Waller, I said, are you aware that your opinion that you've now written after this phone call, except for a few ministerial changes in the cash accounts and the bank accounts, is exactly the same as the letter that was sent a year prior by counsel saying this is what they want for their dissociative values? I said, do you know they're the same? He said, yeah, I'm aware. I said, okay. And I asked him one more question. I said, if on that phone call that you had with counsel, if you were to give him a professional opinion, anything other than that asset value alone is what you believe the fair value of is, do you think he would have been hired to do the job? And at trial, he says yes. He says, I believe I would have. And I said, really, you do? He says, yes. So I had to impeach him. And I asked him the question again with a transcript in hand from his deposition, and asked him the same exact question. And I said, in your deposition, you said, I don't think that would have been the case. So when I asked him the question in his deposition of whether he thought he would have been hired, if he would have had a different opinion, he said, I don't think that would have been the case. And when I asked him, do you recall giving that answer at your deposition? And he says, yes, that's what it says. So I'd ask the court to take that into account with Mr. Waller's opinion that this is only a holding company. Because if we don't find that it's a holding company, and Judge Knight, in his order, was very clear when he said that that determination by Mr. Waller was fundamentally flawed. That was the court's language, fundamentally flawed. He said the operating agreement, the testimony of Mrs. Shuey, especially, and the others made it clear. Even Mark Shuey said that they were intended to farm the property for the family, and it was going to pass to the family, et cetera. The court said there's no evidence in the record to support it's a holding company. And so the court concluded that it was not a holding company. So Mr. Waller's opinion of value hinged solely upon the holding company. He didn't take any other approaches. They took no steps at all to say, well, if it's not a holding company, what's the value? They had Mr. Osborne's evaluation that followed the standards of the law, that Stanley points out, and that even the case that counsel pointed out, which is Ryewood's, that talks about the court can use all of these various methods. Anything that will get to fair value is a going concern. The different methods and to weight those methods based upon what it believes are appropriate facts from the history of the business, the intent of the business, dividends that have been paid over time, all of the stuff that Mr. Osborne did. Mr. Waller had nothing to oppose that. There's no evidence in the record, and the counsel kind of pointed on that, kind of making my argument for it. There's no evidence in the record as to any range saying that, well, Mr. Osborne used, for example, which I think is the big one that we need to cover, Mr. Osborne used 5% on the value of the real estate because Mr. Osborne's testimony was that talking to all of the people that are in the business and future outlook, there's no intent to sell any of this real estate. This real estate is not intended to be sold. It was intended to be a farming family business. So Mr. Osborne's evaluation, he gave weights of all of these methods which support family property rights. 5% for that asset value method, and he gave higher values to the dividends and the earnings values because he said that's what this company's been doing. They put this property in this LLC. It's held for the benefit of the family, and they're going to pay out some earnings, et cetera, buy some more real estate, and then at some time, as Mr. Shue testified, and it's important to find in the operating agreement, if sometime in the future the majority of my family decides they don't want to do this anymore, they have the ability to liquidate it. Mr. Osborne put a small value on that because there's no evidence in the record that that was ever going to occur. Counsel? Sir? Can I ask you about the interest rate? Didn't the judge come up with the interest rate by looking at the Wall Street Journal? Correct. Good question, sir. I'm glad you brought that up because I was going to touch upon those few issues later on. Counsel points to the interest rate in the judicial notice, and as the case was proceeding, counsel on his count five prayed for a 5% interest rate. There's no evidence was adduced at trial on what a proper interest rate would be. He didn't put anything in. There's nothing in the record. The court will find no evidence whatsoever at trial. He points to two places in the record. The first one that he points to is the prayer for relief. The second thing that's pointed to is the, like, briefing and support of their position after the proofs had been closed, saying that we would walk 5%. There was nothing in the record, so I put on nothing in opposition because the plaintiff didn't look for any evidence that I had to refute. So Judge Knight, I agree that the statute says you must pay interest. It does say that. I think the court found itself in a position where I certainly wasn't going to walk high on what an interest rate was. It wasn't my burden. Counsel had that burden. He didn't do it. So I don't think the court had any evidence in the record to do that, and I certainly wasn't going to raise the issue. So if we're going to be asking one that we think the court has enough information to rule here, if it sends it back on remand, which I understand, I think the court can take that on. But, again, there's no proofs in the record to support any interest rate whatsoever. If Judge Knight's judgment of value reflect your expert's evaluation, or did it differ as he weighted the percentages different? Yes, sir. I'm glad that we've gotten to that. That's, in fact, our argument here. I think if you look at the Stan case, and I think if the court actually looks at the Knight Circuit case that we've cited, it's almost exactly on point, sir. And it talks about what evidence was in the record before the court and whether the weights that were used by the court differed from the evidence. And in that case, they found that it did. In that case, like ours, the court had, the tax court in that case, had adjusted those weights. And the appeals court in Knight said, really, you got into creating scenarios that didn't exist in the record. And that's our argument, sir, is that's what Judge Knight did in this case. And if you recall, he actually tried to reopen the proofs. The court did after it had ruled this is not holding company. He wasn't particularly excited about our client's position because he said our client took the position most favorable to our client. And I was like, yeah, that's what we do. But we didn't feel it was our concern at that time that the opposing side had relied solely upon that asset value and didn't put anything on. So our position is that once Judge Knight discounted and found their fundamentally flawed, all that's left in the record is Mr. Osborne's. There's nothing else. And so Mr. Osborne gave specific weights to every one he used. He put a basis for why he did that from talking to the people, et cetera. And Judge Knight altered those. And our position is it's based upon standard. And the Castina case and others, as long as the court in its abuse of discretion standard rules within the range of evidence provided, then he has that discretion. But in this case, there is no range of evidence because they didn't put any on, sir. There's not any. So our position is that Mr. Osborne's opinion is the only one left in the record. Thank you, counsel. Yes, sir. Five. Counsel, I'm going to start off with you. Again, I think listening to Mr. DeBoer, that basically your client's position is that counts one through four were necessarily disposed of and tried. So let me, counts one and two were for appointment of a receiver and dissolution of the company, respectively. Now, with dissociation, you would agree that those would have been resolved? Correct. Okay. Now, counts three and four were requests for an accounting and three. And then all four request damages for alleged breaches of fiduciary duty. Counsel, do you believe these issues were also necessarily disposed of when the court awarded your client's fair value for their interest in the company? Yes. I believe that we were provided all the information we would have received in an accounting action. And I believe that Judge Knight's order even awarded us, or I'm sorry, awarded the company some unpaid rents that were part of the breach of fiduciary duty action. And I think he even went so far as to determine that additional rents weren't going to be awarded. But I believe all those have been resolved, yes. If I remember you earlier, I didn't bring the work list down for you. All right. I believe there are those. I point to the language in the trough court's order that's final and appealable, and there's no just reason to delay enforcement or appeal. The only point I wanted to bring up in the rebuttal time was this issue of this company and how it's defined. And it's true that the company makes an income by renting real estate. And the counsel can stand here and say that the company doesn't intend to, based on its operating agreement or the intents of the parties, doesn't intend to ever sell real estate, does a whole real estate for appreciation. I'm not sure that's clear from the operating agreement, and that's what would govern. But it's also clear in the record that this company does not make any effort to maximize income. And it's clear in the record that the company, for at least the last five years, has rented real estate to people below fair market value. And so to stand here and say that this is something else, some income-producing entity, it's not. It doesn't make any effort to make fair market rents on its real estate. And not only does that affect the character of this company, it affects the valuations, and this was in the testimony. It affects the valuations put forth that aren't net asset value. Net asset value, when you look at it, does not make an account for income because it's just a valuation of the assets. Every other method that was advanced, the dividend stream, the earning stream, and this hypothetical liquidation in the future, all depend and factor in the income that the company makes. And if you have a company that's not seeking out fair market incomes, you're going to wind up using that number in your calculus with a valuation that's not a fair valuation of the company because it's factored in. Your income, if your income is half of what it should be, all those factors, income methods, the value of companies, are going to be lower than what they should be if the company had been seeking fair rents. And there was evidence in the record that the rents were at least $75 an acre, too low. I think that's what the judge decided. There was evidence that it was about half of what it should be. And so to rely on historical data based on rents, fair market rents, renders all those calculations inaccurate and not providing a fair value for this company. That's all I have on such questions. Thank you, counsel. We'll take the matter under revision and issue a decision in due course. Court is standing in recess. Court recessed.